# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DEBORRAH GUNDER,

     **Plaintiff,**

     v.                                  **Case No. 20-CV-724-SCD**

ANDREW M. SAUL,
**Commissioner of Social Security,**

     **Defendant.**

---

## DECISION AND ORDER

Deborrah Gunder seeks social security disability benefits based on various physical and mental impairments. Following a hearing, an administrative law judge determined that Gunder was not disabled because she could still work with certain physical limitations; in reaching that finding, the ALJ concluded that Gunder's mental impairments did not result in any functional limitations. Gunder now seeks judicial review of that decision, arguing that the ALJ failed to accommodate all her impairments and erred in not deferring to the opinions of her treating doctors. Because substantial evidence supports the ALJ's decision and Gunder has failed to demonstrate that the ALJ committed an error of law in reaching his decision, I will affirm the denial of disability benefits.

## BACKGROUND

Gunder filed this action on May 12, 2020, seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me in July 2020 after all parties consented to magistrate-judge

jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6, 7. It is now fully briefed and ready for disposition. *See* ECF Nos. 22, 26, 29.

## I.    Procedural History

Gunder applied for social security disability benefits in October 2016, alleging that she became disabled on May 5, 2016, when she was fifty-one years old. R. 2174, 2406–12.[1] Gunder asserted that she was unable to work due to right radial nerve palsy, systemic lupus, elevated liver function, diverticulosis, irritable bowel syndrome with chronic diarrhea, depression, overactive bladder and frequent urinary tract infections, gastroesophageal reflux disease, tremors, and multiple vitamin deficiencies. R. 2437. According to Gunder, these impairments impacted her ability to lift, squat, stand, reach, walk, kneel, climb stairs, remember, complete tasks, concentrate, and use her hands. *See* R. 2450–59.

Gunder's application was first reviewed at the state-agency level by the Wisconsin Disability Determination Bureau. *See* R. 2247–2311. At the initial level of review, the state-agency physician charged with reviewing the medical evidence of record opined that Gunder could perform light work with certain postural, manipulative, and environmental limitations. R. 2253–54, 2258–61. Based on her review of the record, the state-agency psychologist opined that Gunder's depression did not significantly limit her ability to do basic work activities. R. 2255. Specifically, the psychologist opined that Gunder had only a "mild" limitation in each of the four areas of mental functioning a person uses in a work setting (known in social security lexicon as the "paragraph B" criteria): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and

---

[1] The transcript is filed on the docket at ECF No. 16-1 to ECF No. 16-18.

adapting or managing oneself. R. 2256. Based on those findings, the state agency determined that Gunder was not disabled and denied her application. *See* R. 2247, 2263.

Gunder requested reconsideration, alleging that her physical and mental symptoms had worsened. *See* R. 2471. She also alleged that she was recently diagnosed with osteoarthritis and tendonitis on her right side. *Id.* The state agency referred Gunder for a psychological consultative examination because "[a]dditional evidence [was] required to establish current severity of [her mental] impairments." R. 2253.

Anthony Wendorf, PsyD, examined Gunder in March 2017 and prepared a report of his findings. *See* R. 2904–08. Dr. Wendorf noted that Gunder was depressed throughout the evaluation and that her concentration, persistence, and pace were poor. R. 2905. During the mental-status examination, Gunder demonstrated linear and logical thought content, good remote and recent memory, adequate fund of knowledge, adequate abstract thinking abilities, and fair to good insight and judgment. R. 2905–06. However, Gunder did appear anxious, and she struggled to do serial 7s and 3. R. 2906. In his exam summary, Dr. Wendorf wrote, "After meeting with Deborah, it became clear that . . . [she] was struggling with past trauma and depression. She would benefit from individual psychotherapy as well as pharmacological evaluation to determine the efficacy of any psychotropic medications, which could help remit her symptoms at this time." *Id.* He diagnosed major depressive disorder, recurrent and severe. *Id.*

As for her work capacity, Dr. Wendorf opined that Gunder showed moderate limitations in her ability to understand, remember, and carry out simple work instructions and to respond appropriately to supervisors and co-workers. R. 2907. Dr. Wendorf further opined that Gunder showed severe limitations in her ability to maintain concentration,

attention, and work pace and to withstand routine work stresses and adapt to changes. *Id.* Finally, Dr. Wendorf believed that Gunder could manage her own funds if awarded disability benefits. *Id.*

Thereafter, Gunder's application was denied at the reconsideration level. *See* R. 2265–86. Like the state-agency physician at the initial level of review, the state-agency physician at the reconsideration level opined that Gunder could perform light work with certain postural, manipulative, and environmental limitations. R. 2278–81, 2305–08. Russell Phillips, PhD, the state-agency psychologist at the reconsideration level, agreed with the initial reviewing psychologist that Gunder did not have a severe mental impairment. R. 2275–76, 2302–03. According to Dr. Phillips, Dr. Wendorf's opinions that Gunder had severe limitations with stress tolerance and concentration, persistence, or pace were unsupported by his own exam findings and inconsistent with other evidence in the record, including Gunder's self-reports. R. 2276, 2283, 2303, 2308–09.

After the Commissioner denied Gunder's application at the state-agency level, Gunder (along with her attorney) appeared via video for a hearing before ALJ Wayne Ritter on March 8, 2019. *See* R. 2195–2246. Gunder testified that she was unable to work due to a number of physical and mental impairments. She described several physical impairments, including undifferentiated connective tissue disease, fibromyalgia, osteoarthritis, autoimmune hepatitis, carpal tunnel syndrome, peripheral neuropathy, right radial nerve palsy, and tremors. *See* R. 2204–07, 2209–12, 2223–27. Gunder testified that she also had recurring urinary tract infections, diarrhea, diverticulosis, and a spastic bladder. R. 2207–10. Because of her incontinence issues and frequent bowel accidents, she wore two diapers at night and went through six to eight pads during the day. R. 2208. As for mental impairments, Gunder testified

4

she suffered from depression, anxiety, and post-traumatic stress disorder. R. 2206. She described being on and off anti-depressant medication since she was twelve years old and seeing a psychologist monthly since the previous summer (2018); she also recently started seeing a psychiatrist. R. 2222.

Gunder testified that she last worked as a converting machine helper for a paper company. R. 2212–15. Before that she worked as a customer service representative, a quality assistant, and an administrative assistant. R. 2214–21. Gunder stopped working on May 6, 2016, after she was hospitalized when she woke up with no feeling on the right side of her body. R. 2213.

With respect to her functional abilities, Gunder testified that she was given a five-pound lifting restriction and that she had difficulty picking up and holding onto things. R. 2227–29. She stated that she could stand in one position for fifteen to twenty minutes at a time and sit for up to thirty minutes before she started to get squeamish. R. 2229–30. Gunder also claimed that she was easily distracted:

> I can do things for about 15–20 minutes at a time, but I find myself—if I don't complete the task, then I have to go back multiple times during the course of the day to complete that task. I have to write down notes for things I don't remember.

R. 2229.

Susan Entenberg testified at the hearing as a vocational expert. *See* R. 2230–45. According to Entenberg, a hypothetical person with Gunder's age, education, and work experience could perform her past relevant jobs as an administrative assistant, a quality technician, and a customer service rep if she were limited to a restricted range of light work. R. 2231–33. That person could also perform other jobs, such as a cashier, a hotel housekeeper, and a sales attendant. R. 2233–34. Entenberg testified that no jobs would be available if the

5

person had more than one unexcused absence per month (or ten per year) or required unscheduled breaks throughout the workday. R. 2237–40.

On May 8, 2019, the ALJ issued a written decision determining that Gunder was not disabled and denying benefits. R. 2171–94. The Social Security Administration's Appeals Council subsequently denied Gunder's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). This action followed.

## II. The ALJ's Decision

To be considered disabled under the Social Security Act, Gunder had to prove that she was "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The social security regulations set out a five-step sequential evaluation process to determine disability status. *See* 20 C.F.R. § 404.1520(a)–(g). Gunder had the burden of proof at each of the first four steps; the burden shifted to the Commissioner at the fifth, and final, step. *See Due v. Massanari*, 14 F. App'x 659, 664 (7th Cir. 2001) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

Applying this standard five-step process, the ALJ here concluded that Gunder was not disabled. *See* R. 2174–87. The ALJ determined at step one that Gunder had not engaged in substantial gainful activity since May 5, 2016, her alleged onset date. R. 2176.

At step two, the ALJ found that Gunder had three "severe"[2] impairments: peripheral neuropathy/right radial nerve palsy; carpal tunnel syndrome, status-post right release; and undifferentiated connective tissue disease. R. 2176–2180. The ALJ also found that Gunder suffered from a number of non-severe impairments, meaning they did not significantly limit her physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a). For instance, according to the ALJ, Gunder's diverticulosis, gastroesophageal reflux disease, irritable bowel syndrome, and incontinence did not constitute severe medically determinable impairments because "these impairments . . . caused mild or transient symptoms or [were] well controlled with treatment." R. 2177.

Likewise, the ALJ found that Gunder's mental impairments of depression and post-traumatic stress disorder were not severe because they did not cause more than minimal limitation in her ability to perform basic mental work activities. R. 2178–80. According to the ALJ, "[r]ecords reflect limited mental health treatment in late 2018, and indicate her depression was well managed." R. 2178 (citing Exhibits 27F at 5, 39F). The ALJ also found that "[t]reatment notes reflect no significant or persistent functional deficits." R. 2178. The ALJ's non-severe finding was also based on his consideration of the paragraph B criteria. Specifically, the ALJ determined that Gunder had only a "mild" limitation in each of the four broad areas of mental functioning.[3] R. 2178–79.

---

[2] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

[3] The ALJ evaluated Gunder's mental impairments under the new mental impairment regulations, which became effective on January 17, 2017. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (Sept. 26, 2016). According to these new regulations, the adjudicator "evaluates the effects of [a claimant's] mental disorder in each of the four areas of mental functioning based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2). A claimant has a mild limitation in a functional area if her "functioning in [that] area independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id.*, § 12.00(F)(2)(b).

7

In evaluating Gunder's mental impairments at step two, the ALJ also considered the medical opinion evidence in the record. The ALJ assigned "great weight" to the opinions of the state-agency psychological consultants, "as they are consistent with medical records reflecting limited mental health treatment and no persistent associated symptoms." R. 2179. The ALJ also considered the opinions of Dr. Wendorf, the state-agency consultative examiner, but assigned them "minimal weight" because they were "inconsistent with medical records and [Gunder's] history of treatment, and unsupported by his examination." *Id.* The ALJ cited two examples: first, Dr. Wendorf opined that Gunder had a moderate limitation in understanding, remembering, and carrying out simple work instructions despite his mental-status exam showing good recent and remote memory; second, Dr. Wendorf opined that Gunder had a severe limitation in attention even though she was able to spell the word "world" backwards and follow a three-step command during the exam. R. 2179–80 (citing Exhibit 18F).

At step three, the ALJ determined that Gunder's impairments, alone or in combination, did not meet or equal the severity of a presumptively disabling impairment. R. 2180.

The ALJ next assessed Gunder's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. § 404.1545(a)(1). The ALJ found that Gunder could perform "light work"[4] with several non-exertional limitations: only frequent climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; only frequent handling and fingering with the right dominant upper extremity; avoid concentrated exposure to extreme

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

8

cold; avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, and gases; and avoid concentrated exposure to unprotected heights, hazards, and the use of dangerous moving machinery. R. 2180. In assessing this RFC, the ALJ considered the medical evidence, Gunder's subjective allegations, and the medical opinion evidence and prior administrative medical findings. *See* R. 2181–85.

With respect to the opinion evidence, the ALJ first considered the opinions of the state-agency physicians who reviewed the record at the initial and reconsideration levels and opined that Gunder could perform light work with postural, manipulative, and environmental limitations. R. 2183–84 (citing Exhibits 2A, 3A, 6A). The ALJ assigned those opinions "great weight" because they were "consistent with medical records and benefit from their familiarity with disability program policies and evidentiary requirements." R. 2183–84.

The ALJ next considered the opinions of Gunder's neurologist, Xian-feng Gu, MD.[5] On October 30, 2016, Dr. Gu completed a functional assessment form in support of Gunder's application for disability retirement under her employer's retirement plan. *See* R. 2689–94. Dr. Gu diagnosed Gunder with right radial nerve palsy. R. 2690. He opined, among other things, that Gunder could stand or walk one to three hours in an eight-hour workday; sit one to three hours in a workday; never use her hands for repetitive simple grasping, pushing and pulling, or fine manipulation; never reach above shoulder level; never climb; and only occasionally bend and stoop. R. 2692. Dr. Gu further opined that Gunder could perform medium manual activity. R. 2693.

The ALJ assigned "little weight" to Dr. Gu's opinions, finding them "inconsistent with the medical records as outlined above, which do not support any significant limitations to

[5] The parties and the ALJ mistakenly call Gunder's neurologist "Dr. Gui."

9

standing or walking." R. 2184. According to the ALJ, Dr. Gu's reference to radial nerve palsy did not support "any limitation to standing, walking, or sitting." *Id.* The ALJ also concluded that Dr. Gu's opined limitation to medium manual activity was "arguably inconsistent with his own opined limits in standing, sitting, and lifting." *Id.* (citing Exhibit 8F at 5).

The ALJ also considered the opinions of Gunder's primary care physician, Richard McMahon, DO. On January 8, 2018, Dr. McMahon completed a physical work excuse/restriction form in which he opined that Gunder could sit for thirty minutes per day, stand for twenty-five minutes at one time during an eight-hour workday, and never lift more than five pounds. R. 3022. He further opined that Gunder needed to elevate her feet; needed an assisted device; could understand, remember, and carry out simple instructions; was unable to maintain attention for a minimum of two hours; likely would need unscheduled breaks; and likely would be absent from work at least two days per month. *Id.* Dr. McMahon also completed a physical ability assessment form in which he opined that Gunder could stand and sit, respectively, for only one hour at a time; walk for fifteen to twenty minutes at a time; frequently grasp and manipulate with her left hand; occasionally climb, balance, and stoop; and never kneel, crouch, or crawl. R. 3087–88.

The ALJ assigned "minimal weight" to Dr. McMahon's opinions, finding them "inconsistent with, and unsupported by, the available evidence." R. 2184. According to the ALJ, "[m]edical records do not reflect, and [Gunder] does not allege, that she must elevate her legs or that she requires an assistive device to ambulate." *Id.* The ALJ further reasoned that "physical examinations do not indicate any clinical signs or symptoms that would significantly restrict [Gunder's] ability to stand, walk, or sit." *Id.*

Finally, the ALJ considered the opinions of David Toivonen, MD, an orthopedic specialist in hand and upper extremity surgery. In early 2017, Dr. Toivonen restricted Gunder to sedentary work with only light assistance from her right upper extremity up to two pounds. R. 2941, 2948, 3432–36. Dr. Toivonen later indicated that, as of May 8, 2017, Gunder could perform her "current job as tolerated." R. 3433–35. The ALJ assigned "little weight" to Dr. Toivonen's work restrictions because it did not appear they were "intended to be a permanent restriction or to last 12 months." R. 2184. The work restrictions also were "not entirely consistent with the full medical record," in the ALJ's view, as "[s]ubsequent records reflect that [Gunder's] carpal tunnel release surgery was successful, with improved grip strength and no numbness and tingling." *Id.* (citing Exhibits 40F at 52, 43F at 23).

Continuing the sequential evaluation process, the ALJ determined at step four that Gunder was able to perform her past relevant work as an administrative assistant, a customer service representative, and a quality technician. R. 2185. The ALJ alternatively determined at step five that, given her age, education, work experience, and RFC, Gunder could perform other jobs (e.g., a cashier, a hotel housekeeper, or a sales attendant) that exist in significant numbers in the national economy. R. 2185–87. Based on those findings, the ALJ determined that Gunder had not been under a disability from her alleged onset date through the date of the decision. R. 2187.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have

the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

12

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Gunder contends that the ALJ failed to account for limitations stemming from her non-severe impairments in the RFC assessment and erred in evaluating the opinions of her treating doctors.

## I.    Non-severe Impairments

Gunder first argues that the ALJ erred by not considering the symptoms of her non-severe gastrointestinal and mental impairments when formulating her RFC. "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. *2010) (*citing 20 C.F.R. § 404.1523; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)). A failure to fully consider the impact of non-severe impairments requires reversal. *Denton*, 596 F.3d at 423 (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)).

13

### A.    GI Impairments

Gunder contends that the ALJ misrepresented the record and "played doctor" when evaluating her GI impairments at step two of the sequential evaluation process. *See* ECF No. 22 at 17–18.[6] An ALJ impermissibly plays doctor when he ignores relevant evidence and substitutes his own judgment for that of a medical professional. *See Olsen v. Colvin*, 551 F. App'x 868, 874–75 (7th Cir. 2014) (collecting cases). The ALJ here did neither.

At step two, the ALJ determined that Gunder's GI impairments—diverticulosis, gastroesophageal reflux disease, irritable bowel syndrome, and incontinence—caused only mild or transient symptoms or were well-controlled with treatment. R. 2177. In reaching this finding, the ALJ cited treatment notes where Gunder complained of incontinence, occasional diarrhea, and intermitted nausea and bloating. R. 2177 (citing Exhibit 4F at 5, 7; Exhibit 38F). He also noted that Gunder continued to complain about incontinence following her unsuccessful InterStim implant surgery in late 2018.[7] R. 2177 (citing Exhibit 38F). Nevertheless, the ALJ indicated that a bowel x-ray was unremarkable and that an upper GI endoscopy revealed diverticulosis but no other abnormalities. R. 2177 (citing Exhibits 30F at 4, 39F at 64). The ALJ also mentioned a treatment note from August 2018 that stated Gunder's chronic diarrhea had improved since starting on Creon, Gunder's bowel movements were normal for the most part (with only one or two days per week with frequent loose stools), and Gunder's acid reflux was well-controlled on Prilosec. R. 2177 (citing Exhibit 31F at 2).

---

[6] Citations are to the page numbers of the original document, not those added by CM/ECF.

[7] InterStim implant surgery involves the use of an implantable device that stimulates the sacral nerve roots—that is, the nerves that control the muscles used for bladder and bowel function. *See* "Center for Pelvic Health, Navicent Health Sacral Neuromodulation (InterStim)," Atrium Health Navicent, https://www.navicenthealth.org/CFPH/sacral-neuromodulation-interstim# (last accessed May 24, 2021).

14

Gunder cites medical records showing that she continued to experience diarrhea and chronic bowel issues. *See* ECF No. 22 at 14–16. That appears to be true. *See e.g.*, R. 3045–46, 3048–53, 3057–59, 3127, 3137–38, 3208–16, 3222–24, 3504. But Gunder has not cited any significant evidence that the ALJ ignored, and I am precluded from reweighing the evidence here. Moreover, the ALJ never claimed that Gunder was symptom free. Rather, the ALJ determined that Gunder's GI issues did not cause significant limitations, lasted only a short time, and were generally controlled with treatment. Those findings are supported by substantial evidence in the record, and the ALJ did not interpret any medical evidence in arriving at those findings.

Gunder also contends that the ALJ should have either accounted for her bladder and diarrhea issues in the RFC assessment by allowing unscheduled breaks or explained why no such limitation was required. *See* ECF No. 22 at 18–20. I see no error. The ALJ considered Gunder's GI issues and explained why they did not result in any significant limitations. The ALJ also assigned great weight to the opinions of the state-agency physicians who reviewed the medical record and concluded that Gunder's GI issues were not severe and did not result in any functional limitations. *See* R. 2183 (citing Exhibits 2A, 3A, 6A). Gunder has not pointed to any contrary medical opinion or other evidence attributing limitations to her GI impairments. Gunder did testify that she went through six to eight pads each day. However, she has failed to explain why those issues couldn't be attended to before and after work or during normally scheduled breaks.

Accordingly, Gunder has failed to demonstrate that the ALJ erred with respect to her GI impairments and related symptoms.

15

### B. Mental Impairments

Gunder contends that the ALJ committed four errors when evaluating her mental impairments. *First*, she maintains that the ALJ should have adopted the limitations opined by Dr. Wendorf, the examining psychologist paid for by the state agency, who believed that Gunder had moderate limitations in her ability to understand, remember, and carry out simple instructions; moderate limitations in her ability to respond appropriately to supervisors and co-workers; severe limitations in her ability to maintain concentration, attention, and work pace; and severe limitations in her ability to withstand routine work stresses and adapt to changes. *See* ECF No. 22 at 22–24 (citing R. 2907).

"As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). "[B]ut *rejecting* the opinion of an agency's doctor that supports a disability finding is 'unusual' and 'can be expected to cause a reviewing court to take notice and await a good explanation.'" *Jones v. Saul*, 823 F. App'x 434, 439 (7th Cir. 2020) (quoting *Beardsley*, 758 F.3d at 839). "Generally 'a contradictory opinion of a non-examining physician does not, by itself, suffice to reject 'an examining physician's opinion.'" *Thompson v. Berryhill*, 722 F. App'x 573, 581 (7th Cir. 2018 (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

The ALJ here provided a good explanation for assigning only minimal weight to Dr. Wendorf's opinions. First, the ALJ reasonably concluded that Dr. Wendorf's opinions were "inconsistent with medical records and [Gunder's] history of treatment." R. 2179. Gunder criticizes the ALJ for not citing any specific medical records when evaluating Dr. Wendorf's opinions, but he didn't need to. Earlier in his discussion of Gunder's mental impairments, the

ALJ explained that medical records revealed limited mental-health treatment in late 2018, indicated that Gunder's depression was well-managed, and did not describe any significant or persistent functional deficits. R. 2178. The ALJ cited two exhibits from the record to support that explanation: 27F at 5 and 39F. Page 5 of Exhibit 27F is a progress note from August 2017, which indicates that Gunder's depression was "well managed" on Sertraline. R. 3015. Exhibit 39F contains clinic notes from Gunder's psychotherapy sessions with Lori Greer, PsyD. *See* R. 3188–3203. During those sessions, Gunder described relationship issues with her boyfriend and expressed some depressed thoughts, mostly related to her ongoing physical health issues. However, Gunder told Dr. Greer that she had never been hospitalized for mental-health issues, and Dr. Greer did not note any significant functional limitations or recommend treatment beyond continued psychotherapy. The ALJ cited these records in support of his finding that Gunder's mental impairments of depression and post-traumatic stress disorder did not cause more than minimal limitation in her ability to perform basic mental work activities. *See* R. 2178. He had no obligation to repeat those same records when discussing Dr. Wendorf's opinion; his general recall was sufficient. *See Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021) (noting that "nothing in the *Chenery* doctrine prohibits a reviewing court from reading an ALJ's decision holistically") (citing *Jeske v. Saul*, 955 F.3d 583 (7th Cir. 2020)).[8]

Second, the ALJ reasonably concluded that Dr. Wendorf's opined limitations were not supported by his own exam findings. R. 2179. The ALJ cited two examples: (1) Dr. Wendorf

---

[8] Gunder asserts that the ALJ engaged in "circular logic" when he discounted Dr. Wendorf's opinion based on inconsistency with the medical record, as the state agency requested Dr. Wendorf's services because the existing record at the time was inadequate. *See* ECF No. 22 at 21. He fails to appreciate, however, that none of the records the ALJ cited as inconsistent with Dr. Wendorf's opinion existed at the time the state agency ordered the consultative examination.

found a moderate limitation in Gunder's ability to understand, remember, and carry out simple work instructions despite her demonstrating good remote and recent memory during the mental-status examination; and (2) Dr. Wendorf noted during the exam that Gunder could spell "world" backwards and follow a three-step command but still found a severe limitation in attention. *Id.* (citing Exhibit 18F).

Gunder's argument that the ALJ ignored Dr. Wendorf's opinion about her limitations withstanding routine work stress and adapting to changes is based on a misreading of the ALJ's decision. The ALJ recited all of Dr. Wendorf's opined limitations, explained why his overall opinion was given minimal weight, and provided two specific examples in support. The ALJ did not tether his explanation to only certain opinions, as Gunder suggests. In other words, the ALJ determined that *all* of Dr. Wendorf's opinions, including those related to stress and adapting to changes, were inconsistent with the record and unsupported by his examination; he did not need to provide an example for each of Dr. Wendorf's individual opinions.[9]

Gunder's argument that Dr. Wendorf did provide sufficient support for his opined limitations regarding stress and adapting to changes is also unavailing. Gunder notes that during the mental-status exam she reported having a dysphoric mood, anxiety (which she rated 5/10), and symptoms of depression, including sleep disturbance, low energy, irritability, worthlessness, guilt, crying spells, anhedonia (i.e., an inability to experience pleasure from activities usually found enjoyable), social withdrawal, and somatic complaints. *See* ECF No. 22 at 24 (citing R. 2906). She also notes that Dr. Wendorf stated it was clear Gunder was

---

[9] The ALJ did inaccurately state that Dr. Wendorf opined that Gunder had only a moderate limitation in maintaining concentration. *Compare* R. 2179 *with* R. 2907.

18

struggling with depression and that she would benefit from psychotherapy. *See id.* These comments, however, simply support Gunder's depression diagnosis—an issue the Commissioner does not dispute. Gunder has failed to explain how these self-reported depression symptoms support the specific, severe limitations opined by Dr. Wendorf.

*Second*, Gunder criticizes the ALJ for failing to consider that "three separate Doctors found depression in their assessments, supporting the fact that it was indeed persistent and severe." ECF No. 22 at 24. But again, Gunder's depression diagnosis is not at issue. Dr. Wendorf was the only one of the three to offer an opinion on the severity and functional effects of Gunder's depression. The other two simply diagnosed Gunder with depression and helped treat it. A diagnosis alone, however—even by multiple doctors—says nothing about the severity of an impairment or any resulting functional limitations. *See Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) (rejecting plaintiff's argument that her diagnoses of diabetes and hypertension required the ALJ to find that those impairments were severe).

*Third*, Gunder asserts that the ALJ improperly relied on the opinion of Dr. Phillips, the state-agency psychologist who reviewed the record at the reconsideration level and opined that Gunder did not suffer from a severe mental impairment. *See* ECF No. 22 at 25–26. Contrary to Gunder's suggestion, however, Dr. Phillips' reasoning was not flawed. Dr. Phillips indicated that the severe limitations opined by Dr. Wendorf were unsupported by his own exam findings and inconsistent with Gunder's function reports in which she stated that she handled stress and change adequately and described independent daily mental functioning. *See* R. 2276, 2303. Those findings are supported by the record. *See* R. 2450 (initial function report), 2484–91 (reconsideration function report), 2904–07 (psychological report following consultative exam). More importantly, the ALJ never fully endorsed Dr. Phillips' reasoning.

19

Rather, the ALJ assigned great weight to the opinions of both state-agency psychologists because they were "consistent with medical records reflecting limited mental health treatment and no persistent associated symptoms." R. 2179. And I have already explained why that finding is supported by substantial evidence.

*Finally*, according to Gunder, "the ALJ's finding that the impairment would not cause any work-related limitations was unsupported by the record, and in ignorance of [her] subjective reports." R. 22 at 26. It's unclear how this argument differs from the others addressed above. Suffice to say, the ALJ thoroughly explained at step two why Gunder's mental impairments were not severe and did not result in any functional limitations that needed to be included in the RFC assessment. That Gunder disagrees with those findings is not a basis for remand.

Accordingly, Gunder has failed to demonstrate that the ALJ erred with respect to her mental impairments and related symptoms.

## II.     Treating Source Opinions

Gunder argues that the ALJ also erred when weighing the opinions of three treating doctors: Dr. McMahon, Dr. Gu, and Dr. Toivonen. "For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* Social Security Ruling 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996) (rescinded Mar. 27, 2017). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length,

20

nature, and extent of the claimant's relationship with the treating source; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the treating source is a specialist. *See* 20 C.F.R. § 404.1527(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating source's opinion. *See* § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

### A. Dr. McMahon

Gunder contends that the ALJ made four errors when evaluating the opinions of Dr. McMahon, his primary care physician, but none of her arguments are persuasive. *First*, she asserts that "[n]othing in [the] decision indicated that the ALJ gave any consideration to controlling weight." ECF No. 22 at 9. However, the ALJ explicitly found that Dr. McMahon's opinions were "inconsistent with, and unsupported by, the available evidence." R. 2184. The ALJ therefore did consider the two factors (consistency and supportability) used to determine whether a medical opinion is entitled to controlling weight.

*Second*, Gunder takes issue with the ALJ's finding that the record did not support Dr. McMahon's opinions, arguing that his opinions were in fact supported by his own treatment notes. *See* ECF No. 22 at 7–8. She points to only one record, a treatment note from February 2018, in which Dr. McMahon indicated that he had examined Gunder and reviewed records of several specialists who were treating Gunder at the time before filling out her disability forms. *See id.* at 7 (citing R. 3177–78). Dr. McMahon noted that Gunder could "only sit or stand for an hour at a time without having to get up and move around," R. 3177, but that observation appears to be based on Gunder's self-reports rather than any objective finding.

21

Although Dr. McMahon purported to conduct a physical examination, his notes do not mention anything about Gunder's gait (aside from the fact that she was wearing on a boot on her left leg), strength, range of motion, or any other objective criteria that would support his specific sitting and standing limitations. *See* R. 3177–78. Also, Dr. McMahon never explained what the specialists' records said, and he did not attach those records to his notes. The ALJ therefore reasonably found that Dr. McMahon's opinions were not supported by the record. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

*Third*, Gunder accuses the ALJ of not "assessing Dr. McMahon's opinion vis-à-vis the record" and instead finding, in conclusory fashion, that physical exams did not support his opinion that Gunder had significant limitations standing, walking, and sitting. ECF No. 22 at 9. While the ALJ did not cite any specific exams, Gunder does not point to *any* evidence contrary to this finding. Moreover, the Commissioner correctly notes that "physical examinations generally showed that Plaintiff had full muscle strength in her legs, normal gait and station, and normal balance." ECF No. 26 at 16 (citing R. 2685 (normal gait, station, and balance), 2704 (5/5 muscle strength in the lower extremities), 2742 (same), 3058 (normal gait)). The Commissioner's citation of this additional evidence does not violate the *Chenery* doctrine, as the Commissioner is simply pointing to evidentiary support for a finding the ALJ explicitly made. *See Kraus v. Colvin*, Case No. 13-C-0578, 2014 U.S. Dist. LEXIS 59339, at *28–30 (E.D. Wis. Apr. 28, 2014) (noting that *Chenery* "does not hold that the agency cannot cite evidence in the record that supports the actual findings that were made").

22

*Finally*, Gunder criticizes the ALJ for not considering the consistency of Dr. McMahon's opinions with the opinions of her other treating sources, Dr. Gu and Dr. Toivonen. *See* ECF No. 22 at 9. However, the fact that those three opinions are purportedly consistent with each other does not, in and of itself, establish that any of the opinions were entitled to great weight or that the ALJ erred. Indeed, as explained below, the ALJ provided good reasons for affording little weight to Dr. Gu's and Dr. Toivonen's opinions. Gunder's desire for the ALJ to have weighed these opinions differently is not a basis for remand.

### B.    Dr. Gu

Gunder contends that the ALJ also erred in evaluating the opinion of her neurologist, Dr. Gu. *See* ECF No. 22 at 10–12. She criticizes the ALJ for not citing any specific medical evidence, opinion, or treatise to support his finding that the record was inconsistent with Dr. Gu's opined limitations standing, walking, and sitting. This argument, however, fails for the same reasons discussed above regarding Dr. McMahon's opinions: although Gunder correctly notes that the ALJ failed to cite specific exam findings, she does not cite any contrary evidence in the record, and exams did generally show that she had a normal gait and full strength in her lower extremities. Moreover, the ALJ did not need any specialized training to point out that Dr. Gu failed to explain how Gunder's right radial nerve palsy—that is, a condition affecting her right upper extremity—resulted in limitations standing, walking, and sitting.

Gunder also accuses the ALJ of ignoring Dr. Gu's opinion that Gunder was unable to perform repetitive lifting, grasping, or fine manipulation. But the ALJ did explicitly acknowledge that opinion:

> Xiam Gui, M.D., opined in October of 2016 that the claimant is limited to standing or walking 1-3 hours a day, sitting 1-3 hours a day, and can do no repetitive lifting, grasping, or fine manipulation, occasional bending or stooping, and no climbing, due to right radial nerve palsy

23

R. 2184 (citing Exhibit 8F at 4). The ALJ also explained that Dr. Gu's opined lifting limitation was "arguably inconsistent" with his opinion that Gunder could perform medium manual activity, *see* R. 2184 (citing Exhibit 8F at 5), which the *Dictionary of Occupation Titles* (the source Dr. Gu was instructed to consider) defines as "[e]xerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently," *see* "Appendix C: Components of the Definition Trailer," Dictionary of Occupational Titles, https://occupationalinfo.org/appendxc_1.html (last revised Apr. 11, 2020).

Furthermore, the ALJ sufficiently explained how he accounted for Gunder's upper extremity impairments earlier in his decision. The ALJ noted that Gunder "was diagnosed with peripheral neuropathy due to radial nerve palsy, and later found to have carpal tunnel syndrome." R. 2181 (citing Exhibits 11F at 2, 15F at 2). The ALJ also noted that both of those conditions significantly improved with treatment, including occupational therapy in 2016 and carpal tunnel release surgery in November 2017. *See* R. 2181–82 (citing various medical records). And the ALJ explained that he accounted for Gunder's neuropathy and carpal tunnel syndrome by limiting her to "light exertional work, with no more than frequent handling and fingering with her right upper extremity." R. 2182. The ALJ did not need to repeat this analysis a few pages later when addressing Dr. Gu's opinions; it is clear from reading his decision as a whole why he rejected Dr. Gu's opinion that Gunder had significant manipulative limitations.

### C.    Dr. Toivonen

Finally, Gunder contends that the ALJ erred in evaluating the opinion of Dr. Toivonen, a specialist who focused on Gunder's upper extremity issues. *See* ECF No. 22 at 12–13 She accuses the ALJ of speculating that Dr. Toivonen's lifting restriction was not meant

24

to be permanent, but that finding is supported by the record. Although Dr. Toivonen initially restricted Gunder to sedentary work with only light assistance from her right upper extremity up to two pounds, he later indicated that, as of May 2017, Gunder could perform her "current job as tolerated." R. 2941, 2948, 3432–36.

Gunder also criticizes the ALJ for citing her successful carpal tunnel release surgery as a reason for giving Dr. Toivonen's opinion little weight. However, in citing those subsequent treatment records, the ALJ did not assume that the surgery completely resolved Dr. Toivonen's opined restrictions. Rather, the ALJ cited records noting that Gunder's upper extremity symptoms improved following surgery, including improved grip strength and no numbness or tingling in her right upper extremity. *See* R. 3320, 3467. The ALJ therefore reasonably determined that Dr. Toivonen's opined limitations were no longer persuasive given more recent medical records. And the ALJ accommodated Gunder's upper extremity impairments in light of these recent records.

\* \* \*

Accordingly, Gunder has failed to demonstrate that the ALJ erred in evaluating the treating source opinions of Dr. McMahon, Dr. Gu, or Dr. Toivonen.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ's decision is supported by substantial evidence and that Gunder has not demonstrated that the ALJ committed reversible error in failing to include any limitations stemming from her GI or mental impairments in the RFC assessment or in failing to adopt the opinions of her treating doctors. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this <u>9th</u> day of June, 2021.

_____
STEPHEN C. DRIES
United States Magistrate Judge